# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 20, 2022      Decided December 20, 2022

No. 21-1233

CHINA TELECOM (AMERICAS) CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

---

On Petition for Review of an Order
of the Federal Communications Commission

---

*Russell M. Blau* argued the cause for petitioner. With him on the briefs were *Andrew D. Lipman* and *Raechel K. Kummer*.

*Scott M. Noveck*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, *Sharon Swingle*, *Casen Ross*, and *Dennis Fan*, Attorneys, and *Jacob M. Lewis*, Acting Deputy General Counsel, Federal Communications Commission. *Matthew J. Dunne*, Counsel, Federal Communications Commission, entered an appearance.

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Confronted with reliable claims of escalating Chinese cyber threats targeting the United States, the Federal Communications Commission ("FCC" or "Commission") revoked the authority of China Telecom (Americas) Corp. ("China Telecom") to operate domestic and international transmission lines pursuant to section 214 of the Communications Act of 1934. *China Telecom (Ams.) Corp.*, FCC 21-114, 36 FCC Rcd. ---, 2021 WL 5161884 (Nov. 2, 2021) ("Revocation Order"), Joint Appendix ("JA") 562-662. China Telecom now petitions for review.

After two rounds of written submissions and one round of public comments, the Commission found that China Telecom, "a U.S. subsidiary of a Chinese state-owned enterprise, is subject to exploitation, influence, and control by the Chinese government." Revocation Order, JA 563. The Commission also found that China Telecom's "ownership and control by the Chinese government raise significant national security and law enforcement risks by providing opportunities for [China Telecom], its parent entities, and the Chinese government to access, store, disrupt, and/or misroute U.S. communications, which in turn allow them to engage in espionage and other harmful activities against the United States." *Id.* The Commission additionally found that China Telecom breached "the 2007 Letter of Assurances with the Executive Branch agencies, compliance with which is an express condition of its international section 214 authorizations." *Id.* Finally, the Commission found that "classified evidence submitted by the Executive Branch agencies further supports [the FCC]

decisions to revoke the domestic authority and revoke and terminate the international authorizations issued to [China Telecom]." *Id*. at 563-64. Although the Commission offered support from the classified record, consisting of evidence obtained pursuant to the Foreign Intelligence Surveillance Act ("FISA"), it has made it clear throughout these proceedings that its decision is entirely justified by the unclassified record alone.

Before this court, China Telecom argues that the Revocation Order is arbitrary, capricious, and unsupported by substantial evidence. It dismisses as speculative the Commission's concern that China Telecom will be used as a vector of cyberwarfare against the United States and disputes the Commission's conclusion that its conduct constituted breaches of the Letter of Assurances. China Telecom also argues that the paper hearing it received was procedurally deficient. It contends that pursuant to the Commission's past practice, the requirements of the Administrative Procedure Act, and the strictures of the Due Process Clause of the U.S. Constitution, the FCC was obligated to grant China Telecom discovery, an opportunity to demonstrate or achieve compliance, and a live hearing before a neutral adjudicator.

We find no merit in China Telecom's claims. Therefore, we deny the petition for review. In reaching this judgment, we have not found it necessary to rely on the classified record. The Commission's determinations that China Telecom poses a national security risk and breached its Letter of Assurances are supported by reasoned decisionmaking and substantial evidence in the unclassified record. In addition, we hold that no statute, regulation, past practice, or constitutional provision required the Commission to afford China Telecom any additional procedures beyond the paper hearing it received.

## I.  BACKGROUND

### A.  Section 214 Authorizations

The Communications Act of 1934 tasks the FCC with regulating the nation's communications infrastructure. One of the principal purposes of the statute is "national defense." 47 U.S.C. § 151. In furtherance of this statutory purpose, any carrier seeking to use or operate a transmission line for interstate or foreign communications must first obtain a "section 214 authorization" from the Commission. 47 U.S.C. § 214(a). And the Commission "may attach to the [214 authorization] such terms and conditions as in its judgment the public convenience and necessity may require." *Id.* § 214(c).

The Commission has granted blanket authority for any carrier to construct, operate, or transmit over domestic transmission lines, *see* 47 C.F.R. § 63.01(a), "subject to the Commission's ability to revoke [that] authority when warranted to protect the public interest." Revocation Order, JA 565. If a carrier seeks to construct, operate, or transmit over international transmission lines, it must obtain specific authorization from the Commission, *see* 47 C.F.R. § 63.18, and the Commission may later revoke that authorization if warranted to protect the public interest. Revocation Order, JA 565.

A crucial factor considered by the Commission in granting or revoking section 214 authorizations is whether a carrier's use of domestic or international transmission lines raises any national security, law enforcement, or foreign policy concerns. Revocation Order, JA 566; *see also* 47 U.S.C. § 214(b) (requiring notice of section 214 applications to the Secretary of Defense and the Secretary of State). The Commission has had a longstanding practice of seeking "the expertise of the relevant

Executive Branch agencies" – including the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), and the Department of Defense ("DoD") – to help assess national security and other concerns that might arise from a carrier's foreign ownership. Revocation Order, JA 566; *see also Rules & Policies on Foreign Participation in the U.S. Telecomms. Mkt.*, 12 FCC Rcd. 23891, 23919 (1997) ("Foreign Participation Order") (recognizing that "foreign participation in the U.S. telecommunications market may implicate significant national security or law enforcement issues uniquely within the expertise of the Executive Branch"). Under established policies and practice, the Executive Branch agencies may review existing authorizations for national security risks and recommend revocation if the risks cannot be mitigated. *Process Reform for Executive Branch Review of Certain FCC Appls. & Pets. Involving Foreign Ownership*, 35 FCC Rcd. 10927, 10962-63 (2020).

The Communications Act does not specify any procedures to be followed in conjunction with an action to revoke a section 214 authorization. Nor has the Commission promulgated any regulations setting forth any such procedures. Although the Commission has adopted regulations prescribing certain trial-type procedures for the revocation of station licenses and construction permits, those regulations do not apply to the revocation of a section 214 authorization. *See* 47 C.F.R. §§ 1.201-1.377; 47 C.F.R. § 1.91(a), (d).

What the FCC has done is opt in favor of a "written hearing process" for the revocation of 214 authorizations:

> The Communications Act gives the Commission the power of ruling on facts and policies in the first instance. In exercising that power, the Commission may resolve disputes of fact in an informal hearing

proceeding on a written record. And the Commission may reach any decision that is supported by substantial evidence in the record.

[] Accordingly, we amend our rules to codify and expand the use of a written hearing process that can be used in most adjudicative proceedings, including those conducted by an administrative law judge, whenever factual disputes can be adequately resolved on a written record. . . . [T]he Commission or the presiding officer (if other than the Commission) may order that a hearing be conducted on a written record whenever material factual disputes can be adequately resolved in this manner. To determine whether due process requires live testimony in a particular case, the presiding officer will apply the three-part test the Supreme Court adopted in *Mathews v. Eldridge*[, 424 U.S. 319, 335 (1976)].

*Procedural Streamlining of Admin. Hr'gs*, 35 FCC Rcd. 10729, 10732-33 (2020) ("Streamlining Order") (internal quotations omitted).

Before the Revocation Order issued, China Telecom had one domestic section 214 authorization (given pursuant to the blanket authorization issued under FCC regulations) and two international section 214 authorizations. The international authorizations were conditioned on a 2007 Letter of Assurances to the DOJ, Federal Bureau of Investigation ("FBI"), and DHS. The Letter provides, *inter alia*, that China Telecom will "take all practicable measures to prevent unauthorized access to, or disclosure of the contents of, communications or U.S. Records," and "will notify the FBI, DOJ and DHS if there are material changes in any of the facts represented in this letter or if it undertakes any actions that

require notice to or application to the FCC." Letter from Yi-jun Tan, President, China Telecom (USA) Corp., to Sigal P. Mandelker, Deputy Assistant Attorney General, U.S. Dep't of Justice, et al. (July 17, 2007) ("Letter of Assurances"), JA 89-90.

## B. National Security Landscape

The FCC issued the first international section 214 authorization to China Telecommunications Corporation, China Telecom's indirect corporate parent company, on July 20, 2001. Since that time, the national security landscape has changed significantly, with the focus shifting from terrorism to Chinese cyber threats. The Office of the Director of National Intelligence now warns of cyberattacks by the Chinese government and the potential use of Chinese information technology firms as systemic espionage platforms. The DHS now warns that China has used cyber intrusions to steal private sector proprietary information and sabotage military and other critical infrastructure. The FBI now warns that no country poses a broader, more severe intelligence collection threat than China. Indeed, by the end of 2018, the DOJ indicted multiple Chinese state actors targeting the U.S. private sector. The foregoing points are detailed in the *Executive Branch Recommendation to the Federal Communications Commission to Revoke and Terminate China Telecom's International Section 214 Common Carrier Authorizations* ("Executive Branch Recommendation"), JA 17, 20-24.

Meanwhile, China has augmented the level of state control over the cyber practices of Chinese companies. Its 2017 Cybersecurity Law requires Chinese companies to cooperate with state agencies on cybersecurity supervision and inspection. *Id*. at 57. And its 2018 Regulation on Internet Security Supervision by Public Security Organs authorizes the

Ministry of Public Security to conduct on-site and remote inspections of Chinese telecommunication and network companies. *Id*. at 57-58. Consistent with this increasing state control over Chinese telecommunication companies, China Telecom's parent company amended its Articles of Association, pursuant to "the Constitution of the Communist Party of China," to set up Party organizations to perform "core leadership and political functions" and advise the board of directors. *Id.* at 54-55 (emphasis omitted); Revocation Order, 595-96.

## C.   Proceedings Before the FCC

In April 2020 – against this backdrop of tightening Chinese government control over Chinese companies and escalating Chinese cyber threats – several Executive Branch agencies, including the DOJ, DHS, and State Department, recommended that the FCC revoke China Telecom's section 214 authorizations. JA 17-87. The Executive Branch agencies focused on "the substantial and unacceptable national security and law enforcement risks associated with China Telecom's continued access to U.S. telecommunications infrastructure pursuant to its international Section 214 authorizations." *Id*. at 19.

Shortly after receiving the Executive Branch agencies' recommendation, the Commission issued a show cause order directing China Telecom to show why the Commission should not initiate revocation proceedings. In response, China Telecom filed a seventy-two-page brief with fifteen additional exhibits. In December 2020, the Commission found sufficient cause and initiated full revocation proceedings, granting China Telecom a public comment period and another opportunity to file written submissions. In addition to its public comments, China Telecom filed another sixty-two pages of legal and

factual arguments. After reviewing the record, the Commission found China Telecom's arguments unconvincing. In November 2021, the Commission revoked China Telecom's section 214 authorizations and ordered the company to discontinue by January 2022 any services that it offered pursuant to its FCC authorizations.

The Commission's Revocation Order is based on both the national security risks posed by China Telecom and its breach of the 2007 Letter of Assurances. As to the national security risks, the Commission found that the Chinese government could exercise control over China Telecom directly and through its parent companies. The Commission determined that this control, when combined with China Telecom's ability to conduct cyberattacks and disrupt U.S. communications traffic, constituted an unacceptable national security risk. As to the breach of the Letter of Assurances, the Commission found that China Telecom failed to take all practicable measures to prevent unauthorized access to U.S. records and failed to notify the Executive Branch agencies of two FCC applications. On November 15, 2021, China Telecom timely petitioned for review of the Commission's Revocation Order.

In April 2020, before the FCC issued the Revocation Order, the DOJ had provided notice that it intended to use FISA evidence in the Commission's revocation proceedings pursuant to 50 U.S.C. § 1806(c). On November 24, 2020, the United States filed an action in the U.S. District Court for the District of Columbia to determine whether the FISA information must be produced or suppressed. Revocation Order, JA 570; *see* Letter from John C. Demers, United States Assistant Attorney General, et al., to Marlene H. Dortch, Federal Communications Commission (Dec. 8, 2020), JA 430-31; Petition to Initiate a Determination by United States of America, *United States v. China Telecom (Ams.) Corp.*, No. 20-mc-116, 2021 WL

4707612 (D.D.C. Nov. 24, 2020). After full briefing, the District Court held that the FISA information was lawfully collected and need not be suppressed or disclosed to China Telecom. *United States v. China Telecom (Ams.) Corp.*, 2021 WL 4707612 (D.D.C. 2021). The District Court also rejected China Telecom's arguments that it was entitled to disclosure of FISA material on the theory that due process requires a hearing and an opportunity to respond to evidence against it. China Telecom appealed the District Court's decision in the FISA proceeding, and that appeal has been dismissed as moot, vacated, and remanded. No. 21-5215, slip op. (D.C. Cir. 2022).

As mentioned above, although the Commission claims that the classified record supports the Revocation Order, it has made it clear that the Revocation Order is entirely justified by the unclassified record alone. The court's judgment in this matter is based solely on the evidence in the unclassified record.

## II.    ANALYSIS

### A.  Standards of Review

Because the brief filed on behalf of Respondents, the Federal Communications Commission and the United States of America, amply and accurately sets forth the Standard of Review and finds no objection from Petitioner, China Telecom, we adopt much of what has been offered by Respondents:

Under the Administrative Procedure Act, a court may not overturn agency action unless it is arbitrary, capricious, or otherwise contrary to law. *See* 5 U.S.C. § 706(2). Under this "deferential" standard, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and

reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Courts must "presume[] the validity of agency action and must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment." *Cellco P'ship v. FCC*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (citations omitted). And a reviewing court must "'accept the Commission's findings of fact so long as they are supported by substantial evidence on the record as a whole.'" *PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 7 (D.C. Cir. 2020) (quoting *Neustar, Inc. v. FCC*, 857 F.3d 886, 896 (D.C. Cir. 2017)).

The Commission's interpretation of statutes it administers, such as section 214, is reviewed under the principles set forth in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, "if the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "*Chevron* deference does not apply where the statute is clear." *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2291 n.9 (2021).

Finally, as to agency procedures, the "established principle" is that "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *FCC v. Schreiber*, 381 U.S. 279, 290 (1965) (quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 143 (1940)); *see also Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978); 47 U.S.C. § 154(j) ("The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice.").

## B. Substantial Evidence in the Unclassified Record Supports the Revocation Order

We hold that the Commission's Revocation Order is supported by reasoned decisionmaking and substantial evidence in the unclassified record. As noted above, in assessing China Telecom's petition for review, we have given no consideration or weight to any evidence in the classified record.

We find that the Commission's conclusion that China Telecom poses an unacceptable national security risk is supported by the record and justifies the Commission's Revocation Order. We also find the Commission's conclusion that China Telecom breached its Letter of Assurances is supported by the record and independently justifies the Commission's Revocation Order.

### 1. The Record Supports the Commission's National Security Findings

The Commission grounded its conclusion that China Telecom poses an unacceptable national security risk in its determination that the Chinese government is able to exert significant influence over China Telecom and China Telecom is able to conduct cyberattacks against the United States. We find that the record supports these determinations and, therefore, supports the Commission's Revocation Order.

On appeal, China Telecom does not dispute that it is ultimately owned by the Chinese government. Nor has China Telecom disputed that its direct parent entity amended its Articles of Association to set up Chinese Communist Party organizations within the company to "perform core political and leadership functions," including advising the board. Nor

has China Telecom disputed that the majority of the officers and directors of its parent entity are also officers and directors of the entity owned by the Chinese government and exercise control over China Telecom's operations, including reviewing and approving major decisions. And finally, China Telecom has not disputed that China's 2017 Cybersecurity Law on its face requires Chinese telecommunication companies to cooperate with state-directed cybersecurity supervision and inspection. These undisputed facts fully support the Commission's conclusion that China Telecom is unacceptably vulnerable to Chinese government influence.

Likewise, substantial evidence in the record supports the Commission's conclusion that China Telecom's operations give it the capability to access, monitor, store, disrupt, and misroute U.S. communications. On appeal, China Telecom has not disputed the Commission's exhaustive findings regarding China Telecom's access to U.S. records and technical capabilities. Among other things, China Telecom has not disputed that its foreign affiliates may access U.S. records due to their storage on a shared database. Revocation Order, 607-08. China Telecom has not disputed that, as a mobile virtual network operator, it is able to collect customer information, including identifiable personal information, call detail records, and metadata pertaining to customer communications. *Id.* at 609. China Telecom has not disputed that, as a provider of international private leased circuit, international ethernet private line, and multiprotocol label switching services, it is capable of passively monitoring unencrypted content and actively misrouting traffic that traverses its network. *Id.* at 614-16. China Telecom has not disputed that as an internet service provider, it has access to routers, switches, or servers that store and forward traffic and is thus capable of disrupting data and controlling signaling operations. *Id.* at 615-16. China Telecom has not disputed that as an internet router, it is capable of

rerouting U.S. communications traffic, including by redirecting it through China. *Id.* at 617-18. And China Telecom has not disputed that its physical distribution points of presence in the United States allow it to access and manipulate data when one of its points of presence is on the preferred path for U.S. customer traffic. *Id.* at 622-23. These undisputed facts fully support the Commission's conclusion that China Telecom undoubtedly has the technical capability to commit cyberattacks against the United States.

On appeal, China Telecom attempts to dismiss this evidence as "mere speculation" regarding what might happen, not what has happened. Petitioner's Br. at 43. This is a specious claim. The Executive Branch agencies' recommendations to the FCC are supported by compelling evidence that the Chinese government may use Chinese information technology firms as vectors of espionage and sabotage. Indeed, the record reveals a recent string of state-sponsored cyberattacks against the United States. China Telecom fails to acknowledge the DOJ's indictment of multiple Chinese state actors, including – in 2018 alone – indictments of Chinese intelligence officers and hackers targeting information related to commercial airline engines; a Chinese state-owned company engaging in economic espionage related to U.S. trade secrets protecting dynamic random access memory; and two defendants affiliated with Chinese intelligence services stealing proprietary information on telecommunications, electronics, medical equipment, and biotechnology, among other things. Executive Branch Recommendation, JA 22-23.

Moreover, contrary to China Telecom's suggestion, the Commission need not wait for a risk to materialize before revoking a section 214 authorization. In the national security context, "conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects

what we may reasonably insist on from the Government." *Olivares v. Transportation Sec. Admin.*, 819 F.3d 454, 466 (D.C. Cir. 2016) (internal quotations omitted) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010)). "[W]hen it comes to collecting evidence and drawing factual inferences [regarding risks to national security], the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate. Where no factual certainties exist or where facts alone do not provide the answer[,] we require only that the agency so state and go on to identify the considerations it found persuasive." *Olivares*, 819 F.3d. at 466 (citations omitted) (internal quotations omitted).

On substantial evidence review, we "cannot interfere with the agency's latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest." *United States v. FCC*, 652 F.2d 72, 96 (D.C. Cir. 1980) (internal quotations omitted). This is especially true when national security is implicated. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). Seeing that the record supports the Commission and the Executive Branch agencies' policy judgment regarding the national security risk posed by China Telecom, we have no basis upon which to question the propriety of the Revocation Order.

### 2. The Record Supports the Commission's Determination that China Telecom Breached the Letter of Assurances

We also find that the Commission's determination that China Telecom breached the Letter of Assurances is supported

by substantial evidence and independently supports the Commission's Revocation Order.

First, the Commission's conclusion that China Telecom failed to take all practicable measures to prevent unauthorized access to, or disclosure of the contents of, communications or U.S. Records is supported by the record. When negotiating its Letter of Assurances, China Telecom assured the Executive Branch agencies that it would "inform [the Government] if it intend[ed] to store *any* U.S. business records outside the United States prior to doing so." Revocation Order, JA 628 (internal quotations omitted). In a 2016 letter, however, China Telecom belatedly notified the Government that "at times between May 2013 and June 2014, U.S. Records were temporarily stored outside of the U.S." *Id*. at 628. Furthermore, it remains undisputed that, as of March 2021, U.S. records remained accessible in foreign locations, including China, by virtue of their storage on a shared database. *Id.* at 631-33, 648-49.

What constitutes "all practicable measures" involves an expert policy judgment that warrants deference. *See SBC Commc'ns Inc. v. FCC*, 407 F.3d 1223, 1230 (D.C. Cir. 2005) (deferring to agency interpretation of contract); *accord Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 56-57 (D.C. Cir. 2016); *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987). Recognizing the deference we owe to the Executive Branch agencies' recommendations and the Commission's judgment, we hold that the Commission was within its discretion to conclude that allowing China Telecom's foreign affiliates to access U.S. records fell short of taking "all practicable measures" to prevent unauthorized access to U.S. records and therefore breached the Letter of Assurances.

Second, the Letter of Assurances requires China Telecom to "notify the FBI, DOJ and DHS if there are material changes in any of the facts represented in this letter or if it undertakes any actions that require notice to or application to the FCC." Letter of Assurances, JA 89-90. China Telecom does not dispute that it failed to notify the Executive Branch agencies of two FCC applications it filed for International Signaling Point Codes. Revocation Order, JA 627, 638-30, 650. Rather, it contends that the Letter of Assurances merely requires notifications with respect to *material* applications to the FCC. We reject this contorted construction of the Letter. "Material" only modifies the first disjunct regarding "changes in any of the facts represented in this letter" and does not modify the second disjunct regarding "undertak[ing] any actions that require notice to or application to the FCC." Thus, on the undisputed record, the Commission properly concluded that China Telecom breached at least two of the conditions laid out in the Letter of Assurances.

China Telecom argues in the alternative that even if it failed to adhere to all of the terms of the Letter of Assurances, its breaches were not "egregious" enough to justify the FCC's revocation of its authorizations. Petitioner's Br. at 45-46. In response, the Government says that "the potential disruption or misrouting of U.S. communications would be 'egregious' by any definition; so too the failure to comply with commitments made to the government for the protection of national security and public safety, or making inaccurate, incomplete, or misleading representations to government agencies about such matters." Respondent's Br. at 38-39. We agree with the Government.

The Government also says China Telecom is wrong in suggesting that "egregious misconduct" is the sole basis for revoking authorizations. *Id.* at 39. Again, we agree. The

Commission has revoked a number of section 214 authorizations without an official finding of egregious misconduct. *See WX Communications Ltd.*, 34 FCC Rcd. 1028 (2019); *LDC Telecommunications, Inc.*, 31 FCC Rcd. 11661 (2016); *Wypoint Telecom, Inc.*, 30 FCC Rcd. 13431 (2015). And the Commission has long emphasized the importance of prospective national security and law enforcement considerations for section 214 authorizations. *See, e.g.*, *Foreign Participation Order*, 12 FCC Rcd. at 23919-21.

Thus, on the record before us, we find that there is substantial evidence supporting the Commission's determination that China Telecom poses a national security risk and breached its Letter of Assurances. These determinations each justify the Commission's Revocation Order.

## C. No Additional Procedures Are Required

China Telecom insists that it is entitled to discovery, a live hearing before a neutral adjudicator, and an opportunity to demonstrate or achieve compliance. Given the record in this case, however, we hold that none of the additional procedures sought by China Telecom is required by statute, regulation, FCC practice, or the Constitution.

### 1. There Are No Statutory or Regulatory Requirements That Impose Additional Procedures

Congress has granted the Commission broad authority to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j). As explained above, the FCC has broad discretion to craft its own rules "of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Schreiber*, 381 U.S. at 290 (internal

quotations omitted); *see also Vermont Yankee*, 435 U.S. at 543. The Commission has exercised this discretion to "resolve disputes of fact in an informal hearing proceeding on a written record." *Streamlining Order*, 35 FCC Rcd. at 10732. Here, the Commission reasonably determined that the issues raised in this case could be properly resolved through the presentation and exchange of full written submissions before the Commission itself.

As mentioned above, nothing in section 214 itself prescribes any procedure for revocation proceedings. *See* 47 U.S.C. § 214. And China Telecom concedes that the regulations prescribing trial-type procedures do not by their express terms apply to section 214 revocation hearings. Indeed, those regulations implement Title III of the Communications Act and pertain to proceedings regarding station licenses and construction permits, which are not at issue here. *See* 47 C.F.R. §§ 1.201-1.377; 47 C.F.R. § 1.91(a), (d). While the Commission has at times borrowed these procedures for the revocation of a section 214 authorization, *see Procedural Streamlining of Admin. Hr'gs*, 34 FCC Rcd. 8341, 8343 n.16 (2019) (noting Commission's discretion to apply Title III procedures to section 214 hearing), there has been no consistent practice of doing so for all section 214 revocations, *see WX Communications Ltd.*, 34 FCC Rcd. 1028 (2019) (revoking section 214 authorization on written record); *LDC Telecommunications, Inc.*, 31 FCC Rcd. 11661 (2016) (same); *Wypoint Telecom, Inc.*, 30 FCC Rcd. 13431 (2015) (same). Without any consistent past practice of affording trial-type procedures before revoking a section 214 authorization, there is nothing to suggest that the Commission erred in law or judgment in declining to grant China Telecom discovery or a live hearing before a neutral adjudicator.

### 2. China Telecom Was Not Improperly Denied Appropriate Opportunities to Demonstrate or Achieve Compliance

China Telecom contends that under the Administrative Procedure Act, it was entitled to an opportunity to cure its alleged misconduct. Petitioner's Br. at 61 (citing 5 U.S.C. § 558(c)). The Government responds that section 558(c) does not apply "in cases of willfulness or those in which public health, interest, or safety requires otherwise." Respondent's Br. at 65 (citing 5 U.S.C. § 558(c)). According to the Government, "the national security imperatives here could have allowed the Commission to proceed immediately to a decision on whether to revoke [China Telecom's] section 214 authorizations . . . on the basis that 'public health, interest, or safety requires' doing so." Revocation Order, JA 585. China Telecom does not effectively refute this claim.

In any event, even if section 558(c) applies, the Government convincingly argues that the FCC satisfied its requirements by providing multiple opportunities for China Telecom to respond to the Commission's concerns, including to identify any possible mitigation measures. Revocation Order, JA 583-84, 653-54; *see also Order Instituting Proceedings on Revocation and Termination*, 35 FCC Rcd. 15006, 15032-33, 15041-42 (2020), JA 458-59, 467-68 (asking whether the FCC's concerns could be mitigated by measures short of revocation). Based on this record, we see no error in the Commission's determination that China Telecom failed to show any further mitigation measures that could address the serious national security and law enforcement concerns it identified. Revocation Order, JA 652-54.

We agree with the Government that "China Telecom's problem . . . was not that it lacked the opportunity to

demonstrate compliance, but that it was unable to do so." Respondent's Br. at 64. The Commission noted that China Telecom "has not proffered any argument as to how it can address . . . concerns over [its] ownership and control by the Chinese government [that raise] substantial and unacceptable national security and law enforcement risks." Revocation Order, JA 584. And Petitioner appears to concede that, because the Revocation Order focuses on "changes in U.S. foreign policy towards China," China Telecom cannot "conceivably come into compliance" in a way that will satisfactorily address the concerns raised by the FCC and Executive Branch officials. Petitioner's Br. at 62. China Telecom objects that the Commission's determination is not based on a "lawful requirement," *id.*, but we find no merit in this claim. As we have already explained, the Commission's national security concerns alone suffice to justify the Revocation Order.

In sum, even if we assume that section 558(c) applies in this case, we find no procedural error by the Commission. Given the futility of offering China Telecom even more of an opportunity to demonstrate or achieve compliance than they received, the Commission did not err in denying it.

### 3. China Telecom Was Not Deprived of Any Constitutional Rights to Procedural Due Process

China Telecom argues that by refusing to provide the hearing that it sought, the FCC violated China Telecom's due process rights. We find no merit in this claim.

In order to support its claim, China Telecom must show that (1) "the private interest that will be affected by the official action" and (2) the "risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards"

outweigh (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. China Telecom concededly has a significant interest in retaining its authorizations and the concomitant rights to offer services pursuant thereto. However, the value of additional procedures is low, as China Telecom has not shown how such procedures would have better protected its rights or how different procedures might have affected the Commission's judgment.

In requesting discovery, China Telecom failed to identify any unclassified information it sought but was denied. Instead, China Telecom speculates that parts of the classified record could be exculpatory. The simple answer to this concern is that we have independently reviewed the classified record and conclude that it does not contain any potentially exculpatory evidence. FISA makes it clear that a court may conduct *in camera* review of classified materials to determine whether the materials may be suppressed. *See* 50 U.S.C. § 1806(f). Therefore, even though we have relied solely on the unclassified record in assessing the merits of China Telecom's claims, we deemed it appropriate to examine the classified materials *in camera* to determine whether they include any matters that might be exculpatory and justify discovery. *See, e.g.*, *United States v. Muhtorov*, 20 F.4th 558, 624 (10th Cir. 2021) (noting no favorable material in FISA evidence after independent review); *United States v. Moalin*, 973 F.3d 977, 1002 (9th Cir. 2020) (following *in camera* review, court determined that FISA materials did not contain favorable, material information); *United States v. Aldawsari*, 740 F.3d 1015, 1019 n.7 (5th Cir. 2014) (same). On the record before us, we safely conclude that China Telecom cannot show that it was in any way prejudiced by a lack of discovery.

China Telecom also contends that it was entitled to a live or written-record hearing, with a neutral adjudicator. China Telecom was afforded two rounds of extensive written submissions, as well as a round of public comments. The company fails to indicate what, of consequence, it might have sought to do in a live hearing before a neutral adjudicator that it was not allowed to do during the procedure with written submissions before the Commission.

Furthermore, it is telling that China Telecom has not disputed on appeal the most significant findings of fact made by the Commission. For instance, China Telecom has not disputed that it is ultimately owned by the Chinese government. Nor has China Telecom disputed that it has the technical capability to monitor and disrupt U.S. communications. Likewise, the Commission's determination that China Telecom breached its Letter of Assurances does not turn on contested credibility judgments. The conclusion that China Telecom failed to take "all practicable measures" to protect U.S. records because U.S. records remained accessible in foreign locations and the conclusion that China Telecom failed to notify the Commission of two FCC applications as required by the Letter reflect permissible judgments reached by the Commission based on undisputed evidence. What China Telecom disputes are the Commission's legal interpretations of and policy judgments arising from the undisputed facts. A live hearing before a neutral adjudicator was not necessary to resolve those disputes. *See Mathews*, 424 U.S. at 344 (noting no oral hearing required where credibility and veracity are not at issue).

As to the Government's interest, "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307 (internal quotations omitted). Accordingly, our "inquiry into matters of . . . national security is highly constrained." *Trump v. Hawaii*,

138 S. Ct. 2392, 2420 (2018); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."). Here, we are not well-poised to question the FCC's judgment regarding the need for procedural expediency and the need to protect classified intelligence. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (holding that exigencies of national security caution against full trial-type procedures to alleviate burden on Executive); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (noting "due process is flexible and calls for such procedural protections as the particular situation demands"); *Jifry v. FAA*, 370 F.3d 1174, 1183 (D.C. Cir. 2004) (holding pilot's private interest in airman certificates "pales in significance to the government's security interests" and thus no disclosure of classified information required); *Kashem v. Barr*, 941 F.3d 358, 379 (9th Cir. 2019) (noting that "keeping sensitive information confidential in order to protect national security is a compelling government interest" (internal quotations omitted)).

Weighing the *Mathews* factors, the low value of additional procedures and the Executive's weighty interest in national security counsel against requiring any additional procedures in this case. Thus, all things considered, the FCC was not required to afford China Telecom any additional procedures.

## III.   CONCLUSION

For the reasons set forth above, we deny the petition for review.

*So ordered.*